L. A. WEBER, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILROAD Co., Appellant.

CARRIERS: Carriage of Passengers—"Passenger" Defined. Plaintiff, a railway mail clerk, in case at bar, treated as a "passenger."

CARRIERS: Carriage of Passengers—Negligence—Derailment—Res Ipsa Loquitur—Presumption—Sufficiency of Explanation. Derailment of a train, in passenger cases, proclaims negligence, irrespective of other allegations of negligence in the petition. In effect, a derailment says to the carrier: "You have been negligent; explain!" Whether the explanation is sufficient to quiet the accusing voice of the derailment by showing that the derailment was due to causes over which the carrier had no control and against which human foresight could not have guarded, is usually a jury question. To exculpate the carrier, the explanation of the derailment must go further than to show that the facts and circumstances thereof are as consistent with care as with negligence. The evidence of care must preponderate.

EVIDENCE: Opinion Evidence—Opinions from Observation—Ordinary Witness—Law of Necessity—Marks of Crowbar. The opinion of an ordinary witness drawn from what he has observed is admissible when, from the nature of the subject under investigation, no better evidence can be obtained, or the facts cannot otherwise be fully presented to the jury.

DEEMER and PRESTON, JJ., dissent as to the application of the principle.

PRINCIPLE APPLIED: Action for personal injury caused by the derailment of a train. The defendant carrier, claiming that the derailment was due to a cause over which it had no control and against which human foresight could not have guarded, sought to show that a certain named party, just before the arrival of the train, had pried the spikes from the ties with a crowbar and removed the rail. Witnesses were permitted to describe the ties and the marks and indentations thereon, but were not permitted to state to the jury "what caused the impressions upon the ties." The court says: "They should have been permitted to say how the impressions, as they observed them, appeared to have been made there at that time."

**TRIAL: Conduct of Counsel—Acting for Two Clients with Same Interests—Misconduct.** An attorney is not guilty of conduct inconsistent with his duty by acting for one client in a criminal action and for another and different client in a civil action, both actions growing out of the same transaction, when the interests of the two clients are identical, even though the conduct and advice of the attorney results in depriving the defendant in the civil action of the testimony of the defendant in the criminal action.

PRINCIPLE APPLIED: A train was derailed, the engineer killed, and a passenger injured. One K was arrested, tried and convicted of having caused the death of the engineer by deliberately wrecking the train. One H was attorney for K in the criminal action. While this criminal action was still pending, the injured passenger brought action, with said H as his attorney, to recover for his injuries. It was to the interest of K to show that he was not guilty. It was to the interest of the passenger to show that the wreck was caused by some negligence of the carrier—in a word, his interest was the same as the interest of K. It was to the interest of the carrier to show that K was guilty, and thus show that the wreck was due to a cause against which human foresight could not reasonably have guarded. The carrier attempted to take the deposition of K and thereby show K's guilt. K, on the advice or at the direction of H, refused to answer incriminating questions. *Held*, the attorney was not guilty of misconduct.

**EVIDENCE: Hearsay—Exception—Declaration Against Interest—Insanity of Declarant—Law of Necessity.** Declarations of a person as to facts relevant to the matter under consideration are admissible in evidence, even between third persons, where it appears:

1. That the declarant is dead *or insane.*

2. That the declaration was against his pecuniary or proprietary interests.

3. That he had competent knowledge of the facts declared.

4. That he had no probable motive to falsify the facts.

DEEMER and PRESTON, JJ., dissent as to the holding that a show-ing of insanity may be the equivalent of death.

PRINCIPLE APPLIED: A train was wrecked; plaintiff was injured, and sought to recover damages. One K was arrested, and made oral and written statements, while sane, reciting how he had caused the wreck by removing a rail from the track just before the train arrived. Later, K was duly adjudged insane. After being confined for some time, the authorities released him, not as having recovered his sanity, but because safe to be at large. Still later, plaintiff's action came on for trial, at which time K was either in Chicago or New Jersey. Defendant sought to show that K caused the wreck—an act against which human foresight could not have guarded. *Held,* the presumption must be indulged that K was still insane, and the said oral and written statements were admissible.

EVIDENCE: Presumptions—Continuance of Condition—Insanity. A
6 condition once shown to exist is presumed to continue until the contrary is made to appear *by him who asserts such contrary condition.* So *held* in case of insanity.

*Appeal from Pottawattamie District Court.*—A. B. THORNELL, Judge.

FRIDAY, MARCH 19, 1915.

REHEARING DENIED THURSDAY, APRIL 6, 1916.

ACTION to recover for personal injuries. Defendant appeals.—*Reversed.*

*F. W. Sargent, R. J. Bannister* and *Saunders & Stuart,* for appellant.

*Popham & Havner* and *Flickinger Bros.,* for appellee.

GAYNOR, J.—This is an action to recover damages for personal injury claimed to have been sustained by the plaintiff through the negligence of the defendant. There was a trial to a jury, a verdict for the plaintiff, judgment on the verdict, and defendant appeals.

It appears that, on the 20th day of March, 1905, plaintiff was acting as mail clerk in the employ of the United States government, and, as such, was engaged in handling the mail on a mail car attached to and constituting a part of defendant's train.   This train was known as the Rocky Mountain Limited, and this particular train, as No. 41; and it was proceeding westward at the time of the alleged accident. Shortly after leaving Homestead, a town on defendant's line, traveling at a speed estimated as high as 65 miles an hour, it left the track, and plaintiff was injured.

The negligence charged against the defendant, upon which plaintiff predicates his right to recover, is that, on said date and at the place where plaintiff was injured, the railway was in a dangerous condition for trains to pass over it, in that the dump and roadbed were defective, the ties rotten, the rails not properly spiked and clamped to the ties or sleepers, the fastenings loose thereon, the earth on the embankment soft and uneven, and the track uneven or low on one side, by reason of which the same was in an unsafe and dangerous condition, and this condition was known to the defendant and defendant's agents at the time, or had existed for such a length of time before the accident that it should have been known to the defendant by the exercise of reasonable care and inspection.   It was further claimed that the defendant operated its train at too high a rate of speed, in view of the dangerous condition of the track and roadbed at the place of the accident.   The answer was a general denial.

The evidence shows that this was a fast train, if not the fastest on the road.   It was composed of the engine and six cars, attached in this order: tender, mail car, combination baggage and smoking car, a sleeping car called Egypt, another sleeper known as Vespasian, a chair car, and a combination sleeper and observation car.   The train was made up from the engine to the rear end in the order above given.   The plaintiff's run was from West Liberty to Omaha.   The engine, tender, mail car, and combination baggage and smoking car

left the track, and were hurled down to the bottom of the embankment. The two sleeping cars left the track, but were left in an upright position part way down the bank. 'The chair car remained on the top of the dump, but entirely off the track. The combination observation sleeping car was standing with the north wheels of the west trucks on the north rail, and the south wheels off the south rail, and the east trucks on both rails. It appears that the front trucks of the combination observation sleeping car, when it came to a standstill, were 15 feet east of where it is claimed by defendant that the rails became disconnected which dumped the train. The cars had run some distance before they headed down the embankment.

Plaintiff's witness, Hanks, who was in the mail car with the plaintiff at the time of the accident, testifies:

"Next to the chair car was the sleeping car. They were nearly in a straight line headed down the embankment. That night, the car I was in ran for some distance on the ties before it headed down the embankment."

It appears that the embankment was 18 feet across the top and 128 feet wide at the base.

There is evidence that the rail was not out of line on the north side of the track until a point was reached about 33 feet west of where it is claimed by the defendant that the ties were disconnected.

There is no question that, on the night this train was derailed, the plaintiff was in the mail car at the time, and was seriously injured.

The controversy between the parties is as to the cause of this derailment. The plaintiff claims that it was due to the negligence of the defendant, in that it did not make proper inspection of the road at this point, and allowed the roadbed to become in a condition dangerous for trains to pass over it; that the roadbed was defective, the ties rotten, the rails improperly spiked, the fastenings loose, the earth on the embankment soft and uneven, the track uneven and low on

one side; and that this was the cause of the train's derailment.

The defendant claims that the roadbed, ties, rails, spikes and appliances holding them were in good condition immediately preceding the accident; that the south rail of the track, at the place where the injury occurred, was disconnected from the rail just west of it by one Eric Von Kutzlaben; and that the wreck was the result of his wrongful and wicked act in removing the spikes from the ties and disconnecting the two rails within a short time before the train arrived at that point.

These are the two theories upon which the case was submitted to the jury, each theory having some support in the evidence. The jury found for the plaintiff, thus rejecting defendant's theory of the cause of the accident.

This case is not triable *de novo* here, and it is not for us, nor do we assume, to try the case anew upon the facts submitted in this record.

The first proposition that confronts us upon this record is whether or not the plaintiff, at the time of the injury, was, in contemplation of law, a passenger on defendant's train, and, as such, entitled to invoke the rule that

1. CARRIERS: carriage of passengers: "passenger" defined.

has been well recognized in this state and in other jurisdictions, touching the duty of a carrier towards the passengers upon its train.

Upon this point we have to say that we do not understand that the defendant seriously contends that the plaintiff, at the time, did not sustain to the company the relationship of a passenger. However, to entitle him to invoke this rule and to have the benefit of the law regulating the relationship between the carrier and its passengers, it must appear that he sustained that relationship. It is not easy to state a general rule nor to give a definition of the word "passenger" which would embrace all the essential elements. As said in 2 Hutchinson on Carriers (3d Ed.), Sec 997:

"The one usually accepted by the courts, when a definition has been attempted, is that a passenger is 'one who travels in some public conveyance by virtue of a contract, express or

implied, with the carrier, as the payment of fare, or that which is accepted as equivalent therefor.' This definition, however, like all others, is hardly comprehensive enough, for, as a general rule, every person, not an employe, being carried with the express or implied consent of the carrier upon a public conveyance usually employed in the carriage of passengers is presumed to be lawfully upon it as a passenger. There are two main elements in the legal definition of a passenger: first, an undertaking on the part of the person to travel in the conveyance provided by the carrier; and second, an acceptance by the carrier of the person as a passenger. Whether either or both of these elements exist is ordinarily a question for the jury.''

*Cavin v. Southern P. R. Co.*, 136 Fed. 592; *Southern P. R. Co. v. Schuyler,* 135 Fed. 1015; *Illinois Cent. R. Co. v. Porter* (Tenn.), 94 S. W. 666.

In the further consideration of this case, we will treat the plaintiff as a passenger upon defendant's train at the time of the accident. It is, therefore, material to know what the reciprocal duties were that arose out of this relationship. It was the duty of the passenger to exercise reasonable care for his own safety; and to this end it must appear affirmatively that he did not, by his own negligence, contribute in any way to the accident complained of. There is an implied undertaking on the part of the defendant to deliver the passenger in safety at his destination, and to this end, the law imposes upon the carrier the duty of exercising the highest degree of care not to expose the passenger to any danger which human care and foresight could reasonably anticipate and provide against, and to exercise the highest degree of care and diligence reasonably consistent with the practical operation of its railroad and the conduct of its business, and if it fails in the discharge of this duty, and injury results, it is chargeable with actionable negligence.

2. CARRIERS: carriage of passengers: negligence: derailment: *res ipsa loquitur:* presumption: sufficiency of explanation.

In the case at bar, the plaintiff was injured by the derailment of the train. A presumption that the defendant failed in the discharge of its duty to the plaintiff arose when this was made to appear.

Of course, in all cases where the action is predicated on negligence, the burden of proof in the first place rests upon the plaintiff; but, as said in *Pershing v. Chicago, B. & Q. R. Co.*, 71 Iowa 561:

"The rule which casts the burden of proof on the carrier is a rule of evidence, having its foundation in considerations of policy. It prescribes the quantum of proof which the passenger is required to produce in making out his case originally, and he is entitled to recover on that proof, unless the carrier can overcome the presumption which arises under the rule from the facts proven."

While the burden rests upon the plaintiff primarily to show a failure of duty on the part of the defendant in respect to the matters charged, and that this failure was the proximate cause of the injury, this burden is sufficiently sustained in the first place when it is shown that the injury was received by reason of the derailment of the train. This makes a prima-facie case for the plaintiff, and casts the burden on the defendant to show that the injury was not the result of any negligence or carelessness on the part of the defendant, and that the accident was such that defendant could not, by human foresight and care, have guarded against it.

This rule has its foundation primarily in common experience, in that such accidents as are here complained of do not usually and ordinarily occur where the duty has been fully performed by the carrier in the equipment and management of its trains and the construction and inspection of its roadbeds. They are, in every sense, extraordinary accidents, and when they do occur, a presumption arises that the carrier has not discharged its full duty; for they do not usually occur when it does. This, however, is not a conclusive presumption, for experience shows that such accidents do some-

times happen, even when the carrier has performed its full legal duty to the passenger, and so the defendant may relieve itself; but the burden rests upon it to show that it was without fault in the matter.

A reference to plaintiff's pleading will show that he charges several acts of negligence on the part of the defendant, which it is claimed resulted in the derailment of the train. As said in *Whittlesey v. Burlington, C. R. & N. R. Co.*, 121 Iowa 597:

"It is true that in an action against a railroad for injuries received by a passenger, resulting from an accident in the operation of a train, which accident is of such a nature that it would not usually happen without negligence, evidence of the happening of the accident and the injury to plaintiff resulting therefrom, is generally held to be *prima facie* sufficient to establish negligence, and to cast on the defendant the burden of proving want of negligence on its part in connection with the accident."

In *Cronk v. Wabash R. Co.*, 123 Iowa 349, a case in which the plaintiff was injured while riding in the caboose of defendant's freight train, by reason of the derailment of the train, this court said:

"It is said that if the jury found the roadbed or rolling stock defective in any one of the 10 or 12 particulars alleged, this cast the burden of the proof upon the defendant to show that it was not negligent, not only as to that one, but as to all of the specifications contained in the petition. It was not incumbent upon the plaintiff, however, in the first instance, to prove any of these defects. Upon proof that the injury of plaintiff resulted from the derailment of the train, the burden of proof shifted, and was cast upon the defendant to show that the accident was not occasioned by any negligence on its part. * * * But appellant insists that, even though it then proves the efficient cause of the accident, under this instruction, it was bound to go farther, and exculpate itself from every other charge of negligence stated in the petition."

The court, in answering this contention of the appellant, held that, when the company established the *cause* of the derailment, and that it was not responsible in any way for the derailment, it had exculpated itself from the charge of negligence. The presumption of negligence arose from the proof of the derailment and accident, and the burden then shifted to the defendant to show that the derailment was due to causes over which it had no control, and against which human foresight could not have guarded.

This pronouncement of the court is to the effect that the burden of proof rests upon the plaintiff, in the first place, to show his right to recover for the injury alleged. Proof on the part of the plaintiff of his injury, and that the injury resulted from the derailment of the train, makes a prima-facie case; and then the burden of proof shifts to the defendant to show that the accident was not caused by any negligence on its part; and when it shows the efficient producing cause of the accident, and that this was independent of any negligence on the part of the defendant, and due to a cause for which the defendant was in no way responsible, then by this, it negatives the presumption arising from the prima-facie proof, and thereby establishes its freedom from negligence. As in point upon this proposition, see *Gleeson v. Virginia Midland R. Co.*, U. S. Supreme Court, 35 L. Ed. 458. This was an action for damages sustained by a railway postal clerk on defendant's cars by reason of the train's being derailed. The facts in that case, as stated in the opinion, are that plaintiff was a railway postal clerk in the service of the United States; that, in discharge of his official duties, he was making a run from Washington to Danville, in the postal car of the defendant, and over its road; that, in the course of such run, the train was derailed by a landslide which occurred in a railway cut, and the postal car in which the plaintiff was working was thrown from the track, the fireman killed and the engineer seriously injured; that the plaintiff was thrown violently forward by the force of the collision, and also

injured. The defense was that the derailment was caused by rain which had fallen a few hours previously, causing a landslide, and was, therefore, the act of God. Second, that it was a sudden landslide caused by the vibration of the train itself, which no reasonable foresight could have guarded against. The court, after considerable discussion and citation of authorities, makes the following pronouncement:

"The law is that the plaintiff must show negligence in the defendant. This is done *prima facie* by showing, if the plaintiff be a passenger, that the accident occurred. * * * When he proves the occurrence of the accident, the defendant must answer that case from all the circumstances of exculpation, whether disclosed by the one party or the other. They are its matter of defense. And it is for the jury to say, in the light of all the testimony, and under the instructions of the court, whether the relation of cause and effect did exist, as claimed by the defense, between the accident and the alleged exonerating circumstances. But when the court refuses to so frame the instructions as to present the rule in respect to the prima-facie case, * * * it leaves the jury without instructions, to which they are entitled, to aid them in determining what were the facts and causes of the accident, and how far those facts were or were not within the control of the defendant."

The court further in this case said:

"Since the decisions in *Stokes v. Salstonstall,* 38 U. S. (13 Pet.) 181 [10 :115], and *New Jersey R. & Transp. Co. v. Pollard,* 89 U. S. (22 Wall.) 341 [22 :877], it has been settled law in this court that the happening of an injurious accident is, in passenger cases, prima-facie evidence of negligence on the part of the carrier, and that (the passenger being himself in the exercise of due care) the burden then rests upon the carrier to show that its whole duty was performed, and that the injury was unavoidable by human foresight. The rule announced in those cases has received general acceptance, and

was followed at the present term in *Inland and Seaboard Coasting Co. v. Tolson*, 139 U. S. 551 [35:270]."

See, also, *Illinois Cent. R. Co. v. Porter* (Tenn.), 94 S. W. 666.

From the foregoing, we deduce the following principles: It is the duty of a common carrier of passengers to exercise the highest degree of care in transporting its passengers to their destination. To this end, it is its duty to see that nothing which human foresight could guard against happens in the management and control of its trains, its rolling stock, and roadbed that will imperil the safety of the passenger while being so transported. The derailment of a train does not usually and ordinarily occur when the carrier has discharged this duty. Proof of derailment of a train and injury to the passenger is, therefore, prima-facie evidence that the company has not discharged this duty. This is based upon the thought that such accidents do not ordinarily occur when the carrier has discharged its full duty. This showing, therefore, establishes a failure on the part of the company to perform its duty, and out of this arises the actionable negligence.

Common experience also shows that accidents of this kind do arise when the carrier has done its full duty, but this is unusual and out of the ordinary (when we consider the multitude of trains that are being operated every day as compared with the number of accidents from derailment); so then the law wisely shifts to the defendant the burden of exculpating itself, either by showing that it had done its full duty, and the accident was unavoidable and one that could not be anticipated or guarded against, or that it was the result of some independent intervening cause, over which the defendant had no control and could not have guarded against. Upon such showing, and only upon such showing, is the defendant exculpated.

This proposition involves the rule of *res ipsa loquitur*— the facts speak for themselves. The plaintiff was a passenger.

The defendant owed a duty to the plaintiff to transport him in safety to his destination, and not to omit anything which human foresight could anticipate and guard against for his protection. The train was derailed. This is an unusual and extraordinary fact, one that usually and ordinarily does not happen when the carrier has done its duty. Therefore, the fact of derailment speaks for itself, and says that there has been a neglect of duty on the part of the carrier or this thing would not have happened, and challenges the carrier to negative this by proof that it did not fail in the duty imposed upon it by law, and that the accident was the result of conditions which human foresight could not have anticipated and against which it could not have guarded the passenger.

When a railroad company undertakes the transportation of a passenger, the contract implies that it is provided with a safe and sufficient railroad. See *Philadelphia & Reading R. Co. v. Anderson*, 94 Pa. 351; *Feital v. Middlesex R. Co.*, 109 Mass. 398, in which the court said, in discussing a case similar in its legal aspects to the one under consideration:

"A railroad and its cars are constructed and adjusted to each other with the purpose that, when there is no defect in either, the cars shall remain on the track. The fact that a car runs off is evidence of defect or negligence somewhere; and where the track and the cars are under the exclusive control of the defendants, it has been held evidence of negligence sufficient to charge them, in the absence of any explanation showing that the accident happened without fault on their part," citing *Le Barron v. East Boston Ferry Co.*, 11 Allen (Mass.) 312; *Carpue v. London & Brighton R. Co.*, 5 Q. B. 747. "It is not incumbent upon the plaintiff, after proving an accident which implies negligence, to go farther and show what the particular negligence was, when from the circumstances it is not in his power to do so."

See, also, *Lemon v. Chanslor*, 68 Mo. 340, and cases therein cited. *Stokes v. Saltonstall*, 13 Pet. (U. S.) 181.

No better principles are settled in the law than these.

The cause of an accident may be inferred from circumstances. The law sometimes raises inferences as to the existence of other facts from proven facts; that is, where a fact is proved to exist that could not, in the nature of things, come into existence without an adequate producing cause, the cause may be inferred from the existence of the fact. This, however, is only a presumption or an inference based on common knowledge and experience, and is rebuttable. When an ultimate fact is sought to be established by the proving of other facts, the ultimate fact cannot be considered established unless the facts relied upon are of such a nature and so related to each other that it is the only natural or reasonable conclusion to be drawn therefrom.

It is contended by the defendant, however, that the plaintiff's cause of action is bottomed on negligence—a failure on the part of the defendant to discharge its legal duty to the plaintiff; that, to entitle the plaintiff to recover, it must appear affirmatively that the defendant failed in the discharge of its legal duty, and that this failure was the proximate cause of the injury to the plaintiff; and so it is urged that, when the whole record is made, and the circumstances proved on the trial are as consistent with the conclusion of due care as with the conclusion of negligence, no presumption of negligence can be indulged in; and to support this contention, defendant relies upon *Ashcraft v. Davenport Locomotive Works,* 148 Iowa 420; *O'Connor v. Illinois C. R. Co.,* 83 Iowa 105, 111; *Gandy v. Chicago & N. W. R. Co.,* 30 Iowa 420. These cases are those in which no presumption of negligence arises. They are cases in which the burden rested upon the plaintiff to show not only that the defendant was chargeable with the negligence alleged against it in the petition, but that this negligence was the proximate cause of the injury.

In the case at bar, the proof that the plaintiff was a passenger, that the train was derailed, and that he was injured, is all that the plaintiff is required to show. The burden, therefore, shifted upon the defendant, and these cases

are in point, but against the defendant's contention in this case. The fact that the defendant has introduced evidence tending to show that the accident was due to causes over which it had no control is in rebuttal of the fact presumption created by the law, and it is, therefore, ordinarily for the jury to decide and say whether or not it has exculpated itself from the charge of negligence.

In cases in which the plaintiff seeks to recover for personal injuries, and bases his right to recover on distinct acts of omission or commission on the part of the defendant, and predicates actionable negligence on this, the burden of proof rests upon him to show the negligence charged; and, whether he attempts to do this by circumstantial or direct evidence, it cannot be said that he has done so, unless there is a preponderance of the evidence offered and submitted in his favor upon the question. Where the burden of proof rests upon a party to establish an ultimate fact, it cannot be said to be established unless the evidence of its existence or nonexistence preponderates, and this is true whether the burden rests on the party to establish an affirmative or a negative proposition. Thus, the burden of proof rests upon the plaintiff to establish his own freedom from negligence, and surely it could not be said that he had established his freedom from negligence by a showing that his act was as consistent with want of negligence as it was with negligence. By such showing, he could not claim to be relieved from the legal duty to establish by a preponderance of the evidence the ultimate fact that he did not, by his own negligence, contribute to the injury of which he complains.

In the case at bar, the burden was on the defendant to establish a negative fact, to wit: that it was free from negligence contributing to the conditions out of which the accident arose, and it did not do this by a mere showing that it was just as probable that the injury occurred without negligence on its part as that it was guilty of negligence.

When the relationship of carrier and passenger is shown, and an accident occurs which would not ordinarily have occurred had the defendant discharged its full duty, this proof is evidentiary of the ultimate fact that it did not discharge its full duty, and has probative force in establishing the culpable negligence of the defendant. It is a presumption of fact, inferable and determinable from the fact that, where carriers exercise the highest degree of care in the management and control of their conveyances and in the inspection and maintenance of their roadbeds, these accidents do not ordinarily occur; and, therefore, a mere showing on the part of the defendant that the injury *could* have happened, or probably did happen, without any fault or negligence on its part, or by reason of the intervention of some independent agency over which it had no control, does not, as a matter of law, negative the presumption based upon the prima-facie showing. It leaves it still a question for the jury, and especially is this true when the explanation offered by the defendant, by reason of which it seeks to be relieved of the charge of negligence, is of such a character that men might honestly differ as to what was the real cause of the derailment.

It is true that, if the defendant had proved that the accident was due to a cause over which it had no control, or against which the highest degree of care would not have been availing, and which human foresight could not have anticipated and guarded against, then the defendant would be relieved of responsibility. But the burden is on it to do this before it is relieved, and whether it has done this is a question ordinarily for the jury.

We think that there was no error on the part of the court in refusing to instruct the jury to return a verdict for the defendant on the showing made, and as the record then stood. This disposes of the first three errors assigned for reversal.

But it is contended that there was error committed by the

court in the making of the record. It is contended that there was misconduct of counsel for appellee, prejudicial to appellant, in the opening statement. An examination of the record satisfies us that there is no reversible error on this point.

It is next contended that the court erred in sustaining objections to certain questions asked by the defendant, and in striking out, on plaintiff's motion, answers made to questions asked by the defendant of certain witnesses.

3. EVIDENCE: opinion evidence: opinions from observation: ordinary witness: law of necessity: marks of crowbar.

The objections to some of these questions were properly sustained, and to others, the answers properly stricken out, for the reason that in each of these questions the defendant assumed a fact—which is a material fact—without proof of the existence of the fact. As to these questions, instead of asking the witness to detail to the jury what he observed on the ties, their condition, and the impressions there as they were observed, the question assumed (and it was in the line of defendant's contention) that the impression was made by a crowbar; that the marks were made by a crowbar.

In view of the fact that this case must be reversed on other grounds, we do not go into a detailed examination of defendant's contention on this point, but will content ourselves with stating the general rule, and noting a few of the questions which were asked, and objections sustained, which we think constitute prejudicial error.

The witness J. A. Stafford, who claimed to have made an examination of these ties soon after the wreck, testified without objection:

"There was evidence on the track that they (meaning the spikes) had been pulled."

He was then asked this question:

"What do you mean by the evidence on the track that the spikes had been pulled? A. The impression left on the ties of a crowbar having been used. Q. Now, then, when you looked at the ties that morning along the south side of the

rail, did you find any marks on the ties indicating how those spikes had been removed?"

This question was objected to, and objection sustained. In view of the previous testimony, we think this was competent. He was not asked how the spikes were pulled, but whether there were any marks on the ties indicating how they had been removed.

He was then asked this question:

"Now, did you notice any marks on the end of the ties and in connection with the places where the spikes had been drawn or had disappeared from the end of the ties? A. I did see an impression. Q. What marks did you see along there? Tell the jury as plainly as you can. A. Well, it was where a crowbar—you could see where they had been pried out. You could see the impression in the ties where there had been some—had pulled them. Q. Now then, you say that you saw the marks of the crowbar on the tie. Where were the marks of the crowbar with reference to the place where the spikes had been in the tie? (Objected to and sustained.)"

In most instances, the witnesses were permitted to describe to the jury what they saw, the impressions upon the ties as they appeared to them, but were not permitted to state what caused the impression upon the ties. They should have been permitted to say how the impressions, as they observed them there at that time, appeared to have been made. This is a rule of necessity. The best evidence of which a case in its nature is susceptible must be produced and used. It is the only way in which the knowledge of the witnesses as to the ultimate fact, gathered from their inspection and knowledge of the fact, can be brought to the attention of the jury. Some things can be accomplished in many ways. It is often a matter of speculation as to the cause of anything or the manner in which it was accomplished. One who has made an inspection and observation of conditions is in a better position to direct the mind to the primary cause than one who has not had that opportunity. It is not conclusive, but

has probative force. See *State v. Rainsbarger,* 71 Iowa 746, 749; *State of Iowa v. Rutledge,* 135 Iowa 581, 586.

Mr. Lawson, in his treatise on Expert and Opinion Evidence (2d Ed.), and under the head of Opinions from Necessity, p. 513, cites with approval the case of *Graham v. State* (Texas), 13 S. W. 1010, which declares that a nonexpert should be permitted to say that "bruises seem to have been made with a rough, hard substance." The Texas court puts this upon the ground that the statement of an effect produced on the mind "becomes primary evidence, and hence admissible whenever the condition of things is such that it cannot be reproduced and made palpable." See, also, *State v. Hassan,* 149 Iowa 518, 530.

In *State v. Rainsbarger, supra,* this court quotes with approval from Mr. Lawson's work on Expert and Opinion Evidence, p. 505, the following: .

" 'The opinions of ordinary witnesses, derived from observation, are admissible in evidence, where, from the nature of the subject under investigation, no better evidence can be obtained, or the facts cannot otherwise be presented to the tribunal,' " and applies this rule to the *Rainsbarger* case, reference to which is made for the facts to which the rule is applied.

It is the contention of the defendant that the rails at the point where the train was thrown from the track were removed by one Eric Von Kutzlaben, just a short time before the accident.

It appears that, on the 18th day of July, 1907, the defendant undertook to take the testimony of Von Kutzlaben while he was confined in the reformatory at Anamosa, and the attorney for the plaintiff, who was also attorney for Von Kutzlaben, advised the witness that he was not required to answer questions which tended in any way to incriminate him or to involve him criminally in the charge of having derailed this train, and, upon such advice, the

**4. TRIAL: conduct of counsel: acting for two clients with same interests: misconduct.**

witness claimed this privilege and declined to answer the questions. This matter, though urged as error, is not argued directly; but an examination of the record fails to indicate any misconduct on the part of counsel which was not consistent with his duty to the witness, to the court and to this defendant.

A stipulation was entered into between the counsel for plaintiff and defendant that the testimony of this witness should be taken before one Edna Hull, a stenographer, the agreement being as follows:

"It is further agreed that Edna Hull, a stenographer, may take such deposition, and that the transcript thereof need not be sworn to nor verified by the witness, but such transcript may be duly certified by said Edna Hull, a stenographer, to the same purpose and effect as though the same were signed and sworn to by the witness."

This was made immediately before the deposition was taken. Thereupon, the following proceedings were had before said notary:

"Q. State your name, age and place of residence. A. My name is Eric Von Kutzlaben. 27. My residence is really Eisnach, Germany. Q. Where are you at present? A. In Anamosa. Q. Are you an inmate of the penitentiary of the state of Iowa located at Anamosa at present? A. Yes. Q. When were you brought here?"

Thereupon, counsel for the plaintiff advised the witness that he was not required to answer, and the witness declined to answer the question. Counsel for plaintiff notified the witness that he was not required to answer any other question that should be propounded to him on the taking of the deposition. It appears that this deposition was being taken in behalf of the defendant. The deposition discloses that the witness, under the direction of the counsel for the plaintiff, refused to answer the following question:

"Were you convicted in the district court of Iowa, in and for Iowa County, for the crime of the murder of one Hotchkiss, which murder was committed by the derailing of

a train on the defendant's road near Homestead on March 21, 1905? (Witness declined to answer.)  Q. Were you present or about the train on the track of the Chicago, Rock Island & Pacific Ry. which was derailed at that time and place?  Q. Did you not, on or about March 21, 1905, displace the rails on the track of the Chicago, Rock Island & Pacific Ry. at the time and place aforesaid?  Q. Did you not, on or about that date, at that place, draw the spikes that secured the rails on defendant's road about one mile west of Homestead on March 21, 1905, and did you not displace the adjoining ends of said rails at said point, and did not, as the result of drawing said spikes and displacing said rails, a wreck occur to passenger No. 41 at that time and place?"

Other questions of like import were asked, and the witness declined to answer, on the suggestion of counsel, as aforesaid.

It appears that Havner was or had been counsel for Von Kutzlaben, defended him on a charge involving the wrecking of this train, and was also counsel for the plaintiff in this suit. It has been said that you cannot serve two masters, but here the interests of the masters were identical. Havner was interested in protecting his client, Von Kutzlaben, from the giving of incriminating evidence. No man is required under the law to incriminate himself. It was not only the right but the duty of counsel to advise his client of his right under the law before he gave the incriminating testimony. This was all that he did, so far as this record shows, and Von Kutzlaben availed himself of his privilege. Had the testimony been taken in open court, it would have been the duty of the court, on request of counsel, to advise the witness that he was not required to give any evidence that would tend to incriminate him, or subject him to a criminal charge in connection with the wrecking of this train. We see no grounds for reversal on this point.

It appears from the record that, on the trial of this case, the defendant offered in evidence a paper, signed by

Eric Von Kutzlaben, and sworn to by him on the 31st day of March, 1905, 10 days after the plaintiff's injuries, as follows:

5. EVIDENCE: hearsay: exception: declaration against interest: insanity of declarant: law of necessity.

"I, Eric Von Kutzlaben, being first duly sworn, depose and say that I was born in Germany, and that I came to the United States in August, 1903; that I want to tell the whole truth concerning the wreck east of Homestead on the Rock Island Railway; and that I am doing this of my own free will, without fear, intimidation, promise or threats whatsoever. I am the person who caused the wreck. I conceived the plan to wreck this passenger No. 41. I found the wrenches that I used to do so at Homestead about the grain elevator. There is a passageway between the coal shed and the engine room and there I found two wrenches on top of a big timber; one of these wrenches had an iron pipe attached to its handle, but I took the other one without the pipe attached to the handle. I knew where to find these wrenches, as I found them soon after the big snow disappeared, and before I left Homestead. Near the section tool house alongside of the tracks of the Rock Island Railway I found a crowbar between two piles of timber. I did not take it, but left it there. I did not use this crowbar, as I took one from the section tool house at Amana the same night of the wreck, and this was the crowbar I used in committing the act. I used the wrench that I had found at Homestead under the timbers near the coal shed. I took this wrench to take off the nuts off the bolts fastening the plates on the rails. When I met the young man, William Setzer, I threw the crowbar alongside of the tracks, and after he left me I went a short distance south and then came back and got the crowbar. And then went to the big cut where the wreck occurred, and with the wrench unscrewed the bolts fastened to the angle plates and removed the plates and pulled up some of the spikes. I done this shortly before the freight train coming from the west had

passed, and after this freight passed, I took the remaining spikes from the rails. I then spread the rails from where they met about an inch, from the east rail I pulled the spikes from the outside of the rail, and from the west side I pulled the spikes from the inside of the rail, and pried the east rail in a southwestern direction, and the west rail in a northeastern direction. I then took about six pieces of newspaper and covered the rails for about eight feet, this paper extending over the connection of the rails, and I then placed stones alongside of the track on the paper so that the engineer would not discover the rails were out of place. I screwed the nuts back on the bolts after taking off the angle plates, which I threw along the north side of the track. I threw the wrench in the creek near where the train was wrecked. I threw the crowbar at the south side of the east abutment of the bridge, over the small stream directly east, but a short distance of the place of the wreck, and into the same stream I threw the wrench. I then went through the barb wire fence on the south side of the track where the wreck occurred and getting through this fence is where I tore my coat. I then walked about a hundred feet southeast of the fence in the timber and stopped about ten minutes, at which time the wreck occurred. I did not see the train go down the grade. All that I could see was steam coming from the engine. I then went a little west and, leaving the woods, I passed through two gates and onto the track of the Rock Island Railway. On going nearer to the wreck, I discovered that part of the train went down the bank and part did not. I then went up to where the train was wrecked and stood on the roadbed about twenty minutes and saw the fireman. I then went to the mail car and while there I saw the fireman. I remained at the wreck about two hours. I did not enter a car in which there was passengers. I left the wreck about 2:30 A. M. and returned to Amana and retired, and when I got in bed I thought I heard the clock strike four o'clock shortly afterwards.''

This statement was objected to by counsel and the objection sustained; and of this, complaint is made.

The defendant also offered evidence tending to show statements made by Von Kutzlaben shortly after the accident, practically in the line of the statements above set out, which were also excluded by the court. On this, the defendant predicates error.

It appears that, after the occurrence of this wreck, Von Kutzlaben was arrested upon a charge of having wrecked the train and causing the death of the engineer; that he was tried upon this charge and convicted; that he appealed to this court and the case was reversed; that, thereafter, and on or about the 30th day of October, 1908, he was adjudged insane and ordered committed to the department for criminal insane at Anamosa until he became sane.

It appears that, on the 19th day of June, 1909, a writ of habeas corpus was sued out on behalf of Von Kutzlaben, and upon a hearing, the following record was made:

"Now, to wit, on this 19th day of June, 1909, the above entitled matter comes on for hearing on the petition for the writ of habeas corpus . . . the court being fully advised in the premises, and it appearing that all the indictments pending against Von Kutzlaben have been heretofore dismissed upon the motion of the county attorney, and it appearing that there is at this time no criminal charge against him, it is hereby ordered and decreed that the defendant in this action has no further right, power, or authority, to detain or imprison the said Von Kutzlaben in the state reformatory, and he is hereby released, and the defendant warden directed to turn him over to the commissioners of insanity to take such action as they deem best."

It appears that this was accordingly done, and the following proceedings had before the commissioners of insanity in and for Jones County:

"Now, to wit, on this 19th day of June, 1909, the said

Von Kutzlaben having been turned over to the board under the order of the court to be dealt with as in our judgment seems best, we hereby find that the mental condition of the said Von Kutzlaben is such that it is safe to the public that he be discharged, upon the condition that he be delivered into the custody of his mother, and that R. G. Popham is empowered to take charge of him and accompany him to the city of Chicago, Illinois, for the purpose of delivering him to the custody of his mother.''

This order was signed by the commissioners of insanity for Jones County.

It appears that the present trial was commenced in the month of February, 1910. At the time of the hearing of this case from which the appeal was taken, the defendant was at large, residing either in Chicago or somewhere in New Jersey. It does not appear definitely in the record.

There is no evidence showing that the insanity of Von Kutzlaben was judicially determined prior to October, 1908. On that date, upon an inquisition instituted for the purpose of ascertaining his sanity, under Section 5540, Code, 1897, he was determined to be insane, and, based upon this verdict it was ordered and adjudged by the court that the discharge of the defendant at this time would endanger the public safety, and he was, therefore, ordered committed to the department for the criminal insane at Anamosa until he became sane. The presumption of law is that a condition shown to exist continues until the contrary appears. Where it is shown that a party at a given time is insane, this condition will be presumed to continue until the contrary is shown. There was no finding after this in which Von Kutzlaben was adjudged to have recovered from his insanity. The only finding touching the mental condition of Von Kutzlaben was on the 19th day of June, 1909, in which it was found, not that he had recovered his sanity, but that his mental con-

6. EVIDENCE: presumptions: continuance of condition: insanity.

dition is such "that it is safe for the public that he be discharged," and he was accordingly discharged.

There is no evidence that he was insane at the time that he made the statements offered in evidence, and there is no evidence that he was insane at the time that the defendant undertook to take his depositions in July, 1907. Having been adjudged to be insane upon an inquisition made by a proper tribunal, we must, in the consideration of this case, assume that he was insane at the time of the trial, nothing to the contrary appearing. A condition shown to exist is presumed to continue until the contrary appears. As said in 2 Chamberlayne on the Modern Law of Evidence, Sec. 1043:

"If a person has been adjudged insane, the presumption of insanity continues until the adjudication of restoration to reason has been made, and where the issue is as to whether reason has been restored, the burden is upon the party who alleges such restoration to reason, to establish it by a preponderance of the evidence."

See, also, *Tiffany v. Tiffany*, 84 Iowa 122; *Ockendon v. Barnes*, 43 Iowa 615.

When these written and verbal declarations of Von Kutzlaben were offered in evidence, the plaintiff objected to them on the ground that they were incompetent and hearsay. This objection was by the court sustained.

There are, however, well-known exceptions to the rule excluding hearsay testimony. Declarations of a person, whether verbal or written, as to facts relevant to the matter under consideration are admissible in evidence, even between third persons, where it appears: (1) That the declarant is dead; (2) that the declaration was against his pecuniary or proprietary interests; (3) that he had competent knowledge of the facts declared; (4) that he had no probable motive to falsify the fact.

The first showing required to meet the exception is that the declarant is dead. The declaration is then admitted on

the ground that he could not be produced in court to testify to the fact declared upon.

The second ground of the exception is that, at the time the statement was made, it was against his interests to make the statement. This second ground is founded upon a knowledge of human nature, that men do not, usually and ordinarily, speak against their own interests, while very often they are free to speak in their own favor. It is based on the thought that courts can safely trust the man who speaks against himself, and the law substitutes this for the sanction of a judicial oath. The usual tests of credibility are the judicial oath administered and a cross-examination of the witness. The admissions of such declarations rest upon the improbability of a man's admitting as true what he knows to be false, against his own interest. The common law has always regarded the concurrence of these things as a perfectly safe test for ascertaining the truth in all judicial proceedings.

The weight of judicial authority, numerically considered, requires the showing of the first ground of exception to the hearsay rule, before the declaration can be admitted, to wit, that the party whose declaration is offered is dead. Every rule ought to be as broad as the reason upon which it rests. Proof of death establishes the impossibility of producing the declarant upon the trial. To the writer of this opinion, it would seem that a showing that the defendant was intellectually dead—insane—and therefore incapable of being produced as a competent witness, and incapable of testifying because of such insanity, would meet the requirements of the first ground of the exception, and the only reason apparent why courts have rejected proof of insanity as a foundation for the introduction of a declaration made when the party was sane is that there is some uncertainty as to whether the person is insane or not at a particular time. It is a matter not susceptible of exact and definite proof. It may be feigned or assumed for the very purpose of making his declaration competent as against a third party; and further, there must

be an inquisition into the sanity of the party before the declaration is admitted in evidence, and this would require the trial of a distinct issue and an affirmative finding as a basis for the introduction of the statement. We have not been able to find any substantial reason given in the books why the law should make death the *only* test before the statement is admitted.

Mr. Wigmore, in his work on Evidence, Vol. 2, Sec. 1456, states that this exception to hearsay evidence is based upon necessity. The necessity principle, as here applied, signifies the impossibility of obtaining other evidence from the same source, the declarant being unavailable in person on the stand; and he would enlarge the rule to cover insanity as being within the reason of the rule. He says:

"Whenever the witness is practically unavailable, his statements should be received. Death is universally conceded to be sufficient."

He says, however:

"The principle of necessity is broad enough to assimilate other causes; but the rulings upon other causes than death are few. . . . Illness and insanity should be legally sufficient to admit the statements."

*County of Mahaska v. Ingalls,* 16 Iowa 81, was a case in which a suit was brought by the plaintiff county upon a county treasurer's bond, and the treasurer sought to show that the defalcation occurred prior to the execution of the bond, and, to establish this fact, called one White to testify to a conversation had with one Shoemake, who was treasurer of the county prior to that time, but who, at the time of the trial was dead; and over the objection, the witness was permitted to testify:

" 'Mr. Shoemake told me that there was over $2,000 in the summer of 1858, that he was behind as treasurer of the county, and he wanted an arrangement made by which I should pay it.' "

Judge Dillon, speaking for this court in the foregoing case, said:

"The reception of verbal admissions against his interest, and where the declarant is dead, is supported by the following cases (citing cases). . . . Our examination and survey of this subject may thus be summed up. This species of evidence being somewhat anomalous in its character, and standing on the *ultima thule* of competent testimony, is not highly favored by the courts, and the tendency is rather to restrict than to enlarge the right to receive it, or at least to require the evidence to be brought *clearly* within *all* the conditions requisite for its reception. From the unbroken current of English and the decided preponderance of American authority, we think the present state of the law is that verbal declarations are receivable, when accompanied by the following prerequisites: 1st. The declarant must be *dead*. To this we believe the English cases make no exception. Mere absence from the jurisdiction will not answer. *Brewster v. Doane,* 2 Hill (N. Y.) 537, and cases; *Moore v. Andrews,* 5 Port. (Ala.) 107. Although by the course of decisions in some of the states, with reference to written entries, etc., absence might possibly be treated as equivalent to death. See 1 Greenleaf on Evidence, Sec. 163, and note; 8 Watts, 77; 2 Smith, L. Cas. 340 (top); as to insanity, *Union Bank v. Knapp,* 3 Pick. (Mass.), 96. As, in the case at bar, the declarant was deceased, we need not decide whether *death* is, in all cases, an indispensable condition. We need only say that probably the courts would not be inclined to relax the rule so as to dispense with this condition, unless it might be in the case of confirmed insanity. 2d. The next prerequisite is that the declaration must have been *against the interest* of the declarant at the time, and that interest must be a *pecuniary* one. That it would have subjected the party to penal consequences is not sufficient, although this would add to the weight of the testimony. (*Davis v. Lloyd,* 1 C. & K. 275; 11 Cl. &

Fin. 85.)   The conflict of the declaration with the pecuniary interest of the party must be *clear and undoubted,* as this is the main ground upon which the admissibility of this species of evidence rests.   3d. The declaration must be of a *fact* or *facts* in relation to a matter concerning which the declarant was *immediately* and personally cognizable.''

Judge Dillon further said:

''Under the guidance of these principles, as applied to the case at bar, considering the nature of the admissions as being indisputably against the declarant's pecuniary interest, and involving disgrace, if not crime, the time of the admission being not only *ante litem motam,* but before the execution of the bond in suit; the absence of all conceivable motive to falsify; and the impracticability of procuring other evidence touching the same matters, the court are of opinion that the evidence  .  .  .  was properly received.''

Upon an examination of our own decisions, we find the opinion of Judge Dillon quoted with approval.   See *Ellis v. Newell,* 120 Iowa 71; *Moehn v. Moehn,* 105 Iowa 710.   It is also cited with approval in *Smith v. Hanson* (Utah), 18 L. R. A. (N. S.) 520.

Mr. Wigmore, in his work on Evidence, Vol. 2, Sec. 1476, says that in his judgment the doctrine should be extended to include penal interests and all declarations of fact against the interest of the deceased person.   He, however, concedes that the cases have limited the admissibility of the declaration to a pecuniary or proprietary interest at the time made, and our examination satisfies us that the weight of authority is to the effect that, to make such declarations admissible, it must appear that the party making them is incapable of testifying at the time when the declarations are offered, because of his insanity; and that, at the time they were made, they were against his pecuniary or proprietary interest, and were of such a nature as to affect his interests in that respect.

As in accord with the rule laid down by Judge Dillon,

see *Peck v. Gilmer,* 20 N. C. 249; *Smith v. Moore,* 142 N. C. 277 (7 L. R. A. [N. S.] 684); also, 1 Elliott on Evidence, Sec. 436, in which it is said:

"Declarations made by persons who possessed peculiar means of knowing the matter stated, and had no interest to misrepresent it, are admissible in evidence, when pertinent and relevant, whether made orally or in writing, provided, first, that the declarant is dead, and secondly, that such declarations were opposed to the declarant's pecuniary or proprietary interest. They embrace entries in books, and all other written or oral declarations of facts made under the above conditions."

See *Bowen v. Chase,* 98 U. S. 254; *Georgia R. Co. v. Fitzgerald,* 108 Ga. 507; 2 Smith, Leading Cases, 331; *Taylor v. Gould,* 57 Pa. St. 152; *Chenango Bridge Co. v. Paige,* 83 N. Y. 178; *Bartlett v. Patton,* 33 W. Va. 71; *Friberg v. Donovan,* 23 Ill. App. 58; *Hinkley v. Davis,* 6 N. H. 210; *Heidenheimer v. Johnson,* 76 Tex. 200; *Quinby v. Ayres* (Neb.), 95 N. W. 464; *Dixon v. Union Iron Works* (Minn.), 97 N. W. 375.

Nearly all the cases that we have examined are cases in which the declarant was dead at the time the declaration was offered. In those cases, it was not necessary for the court to go beyond the record made in determining whether insanity was or was not a ground for admitting the declaration; and this was true in the case of *Mahaska County v. Ingalls, supra,* and Judge Dillon so states. See *Halvorsen v. Moon & Kerr Lumber Co.* (Minn.), 94 Am. St. 669. Special attention is called to the note on page 673, and citation of cases in support of the text as reported therein. This case will also be found in 91 N. W., at 28, and 87 Minn. 18.

In a few cases that have reached the courts, declarations have been offered and admitted where the party was not dead at the time the offer was made. In *Griffith v. Sauls* (Texas), 14 S. W. 230, we find one of these cases. It was shown that the declarant's physical condition was such that his deposition could not be taken. He could not undergo oral

examination on the stand. He was very old and had lost his power of speech. His declaration was held to be competent, the court saying:

"If Avery had been dead, there could be no question as to the admissibility of his statements about which the witnesses testified, and this would be so because of the inability to produce the witness. If the party whose statements would be admissible if he were dead, from advanced age or other irremediable cause, has lost the power of speech and the ability to testify, either orally or by deposition, what good would it do to produce him? In what would he be better than a dead man in so far as the production of his testimony is concerned? We think the circumstances and condition of Avery, as shown by the record, furnish as satisfactory a reason for admitting his statements as proof of his death would afford."

It is not necessary to go to that length in this case.

*Rothrock v. Gallaher*, 91 Pa. (10 Norris) 108, was an action in which they sought to show the declarations of a party who, from the consequences of ill health and age, had lost his memory. It is true in this case that the witness had previously testified. This testimony, as taken at a former trial, was offered in evidence, although he was present in the court at the time. The court said:

"If he had been dead, . . . it is clear this evidence would have been admissible," citing cases. "We cannot see any substantial reason why the testimony of a witness once duly taken in a pending cause, may not afterwards be read in evidence in another cause between the same parties in regard to the same subject-matter, when in the interval the witness has lost his memory by reason of old age and ill health. The justice and propriety of receiving the evidence are as strong as if the witness were dead, insane . . ., or unable to attend by reason of sickness. Although bodily present, yet if shown to have become so bereft of memory by senility or sickness that he is unable to recall a past transaction to which he had once testified, and has forgotten that he ever testified

in regard to it, he may be considered as practically absent, and his former testimony, if otherwise admissible, may be read in evidence," citing 1 Greenleaf on Evidence, Sec. 163; *Jack v. Woods*, 5 Casey (Pa.) 375; *Emig v. Diehl*, 26 P. F. Smith (Pa.) 359; see also *Harriman v. Brown*, 8 Leigh (Va.) 697.

It was also held, in *Cook v. Stout*, 47 Ill. 530, that, where a witness had died or become insane after his evidence had been taken, it is permissible to prove, as between the same parties, what such witness testified to on the former trial.

It appears that, under the English common law, the court seldom, if ever, admitted the testimony of a witness given on a former trial, except in case of death, placing it practically on the same ground as the declaration of a party made against interest. English courts have modified this, however, and it is thus stated in Stephen on Evidence, Art. 32:

"Evidence given by a witness in a previous action is relevant for the purpose of proving the matter stated in a subsequent proceeding, or in a later stage of the same proceeding, when the witness is dead, or is mad, or so ill that he will probably never be able to travel, or is kept out of the way by the adverse party, or in civil, but not, it seems, in criminal cases, is out of the jurisdiction of the court, or perhaps in civil, but not in criminal cases, when he cannot be found."

This goes to the extreme.

As said by Jones in his work on Evidence, Vol. 2, at 791:

"There has been considerable conflict in the United States as to how far the ancient rule has been relaxed. There can be but little doubt that in this country the rule has been so far modified as to admit such testimony in at least four cases: first, where the witness is dead; second, where he is insane or mentally incompetent; third, where he is beyond the seas; fourth, where he has been kept away by the contrivance of the opposite party."

Jones, in his work on Evidence, Vol. 2, p. 753, discussing this question now under consideration, says:

"It is not enough to warrant the admission of declarations

against interest that the person who made them cannot be produced as a witness. His death must be shown'' (citing *Hart v. Kendall,* 82 Ala. 144; *Fitch v. Chapman,* 10 Conn. 8; *Chandler v. Mutual Life of Georgia,* 131 Ga. 82; *Doe v. Evans,* 8 Blackf. [Ind.] 322; *Mahaska County v. Ingalls, supra,* and other cases), ''or what, for this purpose, is regarded as the equivalent, that he is legally unavailable, . . . being mentally incapable from giving testimony,'' citing *Griffith v. Sauls,* 77 Texas 630.

It is also noted that Judge Dillon, in the *Mahaska* case, *supra,* said:

''As in the case at bar, the declarant was deceased. We need not decide whether *death* is, in all cases, an indispensable condition. We need only say that probably the courts would not be inclined to relax the rule so as to dispense with this condition, unless it might be in the case of confirmed insanity.''

In the administration of public justice, the truth as to the existence or nonexistence of a fact material to be known must be ascertained, if possible. To this end, the courts have demanded that the best evidence of which the case in its nature is susceptible must always be produced. Therefore, when it is shown that a person had knowledge of a material fact, but cannot be produced because of conditions over which neither he nor the persons desiring his presence had control, the courts have held that his oral or written declaration of and concerning the fact may be received in evidence, provided it is shown that, at the time that he made the declaration, he had no motive to falsify. To insure this, the courts have provided, as a test of truth, that the declaration, when made, was against his interest at the time that it was made. This test of truth is bottomed on the knowledge of men—that they do not usually speak to their own hurt. A further test is that the interest affected by the declaration must be personal, certain, and involve interests pecuniary or proprietary.

In case of confessions of crime committed, made by others than defendant, where the interest affected is not certain,

involves no certainty of earthly punishment, and is held to be hearsay, the declaration could·be made, signed and delivered with the distinct understanding that it should not be used until after the declarant's death. Thus, in such cases, courts have excluded declarations or confessions of a stranger that he committed the crime, when these were made in contemplation of immediate dissolution, sometimes called deathbed confessions. *Snow v. State,* 54 Ala. 138; *Green v. State* (Ind.), 57 N. E. 637; *Davis v. Commonwealth* (Ky.), 23 S. W. 585; *Farrell v. Weitz* (Mass.), 35 N. E. 783; *Mays v. State* (Neb.), 101 N. W. 979; *Hodge v. State* (Tex.), 64 S. W. 242; *People v. Hall* (Cal.), 30 Pac. 7; Elliott on Evidence, Vol. 1, p. 441.

*Halvorsen v. Moon & Kerr Lumber Co.,* 87 Minn. 18 (91 N. W. 28), was an action to recover damages for the burning of a building, it being charged that the burning was due to defendant's negligence. Defendant offered to prove by a witness on the stand that one George Schlink stated to him, shortly after the fire, that he was in the burned building on the day, trying lard in the sausage room. When the alarm of fire was given (that is, the fire that it is claimed spread to and destroyed plaintiff's building), he left the boiling kettle and went out to see the mill fire, and when he returned, the kettle had boiled over and.set the room and building on fire. This was rejected by the court. The court said:

"Confessedly the evidence was hearsay, but it falls within a necessary and established exception to the general rule excluding hearsay. The exception is this: Declarations, whether verbal or written, made by a deceased person as to facts presumably within his knowledge, if relevant to the matter of inquiry, are admissible in evidence as between third parties when it appears," then. citing the general rule heretofore stated.

The court then proceeds to say:

"There is no controversy as to the first condition, for it was admitted on the trial that the declarant was dead. The plaintiff claims  .   .  . that the declaration in question was

not against the pecuniary interest of the declarant. We are of the opinion that the facts claimed to have been admitted by him, taken in connection with the fact that he had charge of the sausage room, are the basis of a pecuniary claim against him on the grounds of his negligence.''

See, also, *Griffith v. Sauls, supra.*

Elliott on Evidence, Vol. 1, Chapter 20, Section 441, says:

''Another limitation upon such declaration is that the declaration must be against the pecuniary or proprietary interest of the person making it. A statement is against the pecuniary interest when it tends to lessen the pecuniary value of property of the declarant, or imposes upon him pecuniary responsibility.''

Judge Dillon, in *Mahaska County v. Ingalls,* 16 Iowa 86, in speaking of the declarations made and why they were admissible under the rule, said:

''They were made against the pecuniary interest of the declarant, for they were of such a nature, so circumstantial and precise, as to constitute in an action against him by the plaintiff, the foundation and evidence of a legal liability to that extent. They involved, moreover, the admission of conduct, on his part, which would render him, if known, infamous in the eyes of the public, and criminal in the eyes of the law; for the penal statutes of the state declare that every officer who shall unlawfully 'take, convert, invest, use, loan, or fail to account for, any portion of the public money entrusted to him, shall be imprisoned in the penitentiary, fined in a sum equal to the amount embezzled, and be also disqualified from holding any office under the laws or Constitution of the state.' ''

The record in this case discloses that, after the making of this declaration offered in evidence, and prior to the time of the trial, the defendant had been adjudged insane. There is no evidence that he had recovered from his malady. He was presumed to be insane at the time of the trial. The declarations were made against his pecuniary interest; for

they were of such a nature as to constitute the basis of an action against him for damages, as well as to expose him to a criminal prosecution.

Jones, in his Commentaries on the Law of Evidence, Vol. 2, Sec. 324, says:

"Although most of the cases illustrating the rule are those in which the declarations related to the payment of money, the rule has been frequently declared where other issues were involved, and when the effect of the declaration would be to furnish evidence of facts which could be made the basis of a pecuniary claim against declarant," citing *Halvorsen v. Moon & Kerr Lumber Co., supra; State v. Alcorn,* 7 Idaho 599; *Walker v. Brantner,* 59 Kas. 117; *Georgia R. & B. Co. v. Fitzgerald,* 108 Ga. 507.

We do not want to be understood here as extending the rule in the exception to hearsay evidence, heretofore referred to, beyond the record in this case. Nor do we want to be understood as extending the rule, as suggested, in the cases hereinbefore cited; but we do say that the record in this case shows that Von Kutzlaben was judicially determined to be insane, prior to the time that his declaration was offered in evidence; that there was no showing that he had recovered from his insanity; and that the presumption continues that he is insane at this time. We must not be understood as holding that, under a different showing of facts from what appears in this record, this declaration must be admitted upon a retrial. We simply hold that the rule requiring the showing that the declarant is dead may be extended to cover cases where it is shown that he is insane and incapable of being produced as a witness and of giving testimony upon the trial; and beyond this, we do not care to go at this time.

For the error in refusing to admit these declarations under the record as made, we think the case ought to be reversed.—*Reversed.*

EVANS, C. J., LADD and SALINGER, JJ., concur.

SALINGER, J. (Concurring).  The dissent of my brothers
Deemer and Preston has impelled me to state why I concur in
so much of the opinion as holds that, under some conditions,
insanity is as much the basis for admitting hearsay as is
death.

On March 31, 1905, one Von Kutzlaben signed and swore
to a declaration, in effect, that he derailed the train whose
wrecking injured plaintiff.  About October 30, 1908, upon a
verdict in an inquisition under Sec. 5541, which determined
that he was insane, he was ordered confined in the department
for the criminal insane at Anamosa, to be there detained until
he became sane.  So far as the verdict goes, there was a find-
ing of general insanity.  But the order upon the verdict recites
that he is committed because his discharge then would
endanger the public safety.  Still later, an order in habeas
corpus released him from the reformatory, and directed that
he be surrendered to the Jones County commission of insanity,
for such action as it deemed proper.  This order proceeds on
the expressed ground that no criminal charges are then pend-
ing against him, and that, therefore, there was no further right
or power to detain him in the reformatory.

Said commission found his mental condition to be:

"It is safe to the public that he be discharged upon the
condition that he be delivered into the custody of his mother,
and that R. G. Popham is empowered to take charge of him
and accompany him to the city of Chicago, Illinois, for the
purpose of delivering him to the custody of his mother."

At the time of the trial now on review, had in February,
1910, he was at large, residing either in Chicago or somewhere
in New Jersey.  His declaration was rejected as hearsay.  Our
differences of opinion do not touch four propositions:  (1)
Whatsoever condition said inquisition does establish is pre-
sumed to continue.  (2) Whenever it becomes necessary to
show that this condition has ceased to exist, the burden is upon
him who asserts such cessation.  (3) Other than the order
made by the commission of insanity, there was no release and

no finding or other evidence of recovery. (4) Had it been proved on this trial that Von Kutzlaben was dead, then one of the conditions required to make said declaration admissible, would have existed. Thus, the dividing line between us is clear. On the one hand, it is held that his insanity at the time that his said declaration was rejected was still such as that the same reason for admitting it existed as if he were then dead; on the other hand, that his insanity was not confirmed and general, and that, even if it were, the case is not within the exception which is applied when the declarant is dead.  ·

It does not prove the soundness of a position that the arguments advanced against it are untenable. But here, the ones advanced by the minority come so near to being all that can be said for the claim that death alone makes such a declaration admissible as that whatever demonstrates that such arguments are unsound disproves the position that such arguments seek to maintain.

·    It will conduce to clarity in treatment to eliminate some matters which should be absolutely conceded, and others which are conceded but may be avoided.

I.    (a) The majority is not sustained by cases wherein the declarant was dead, though they do intimate that insanity is a basis which is equivalent to death.

(b)    The views of the majority are not sustained by cases which, upon a showing of either death or insanity, admit a transcript of testimony given by the incompetent upon another trial.  ·

II.    So far as case law and text writers are concerned, the majority has no support except one decided case which supports it squarely, one other decision which, while holding as the majority does, weakens itself by putting absence from the jurisdiction, and the like, into the same class with total insanity, and Mr. Wigmore on Evidence (Vol. 2, Sec. 1456). *Mahaska County v. Ingalls,* 16 Iowa 81, in holding that the rule should not be enlarged, intimates that it might be

"in the case of confirmed insanity." As the declarant was dead, this is not a *decision* of the point now mooted. But, at the least, it leaves the question open in Iowa and creates an atmosphere favorable to relaxing the rule enough to include confirmed insanity. No other Iowa case has foreclosed either the majority or the minority. It cannot be claimed that, if numbers make weight of authority, the majority opinion is in accordance with such weight. But it has not always been the policy in this court to make its view on open questions depend upon counting the number of the cases on each side of the question. It would be difficult to find a case more in conflict with the decisions in all jurisdictions than that of *Mentzer v. Western Union Tel. Co.*, 93 Iowa 752; and, so far as I am advised, the doctrine of that case has been adhered to by us steadily, although the numerical weight of authority against it has been steadily maintained. Nothing in the subject-matter of *Mentzer's* case furnishes a special reason why it should be pronounced or adhered to against numbers. A rule that damages for negligence in delivering a telegram may be recovered for mental suffering without bodily injury is as to this in no different position from a rule of evidence that insanity equals death as a basis for admitting hearsay. As to following numbers, there is no difference between rules of evidence and rules as to what damages are recoverable. It is true, but, as I view it, not material, that rules of evidence were made and adhered to before the telegraph was discovered. Any contention that, because telegraphy is a modern thing, cases opposed to the rule of the *Mentzer* case do not count in testing weight of authority must meet the fact that both the *Mentzer* case and the cases in opposition to it deal with the law of negligence as applied to the delivery of telegrams. Just how a difference resting on before and after the discovery of the telegraph can make a distinction between cases, when all of them were decided after the discovery, I am unable to see. This is no intimation that the *Mentzer* case is not rightly decided, but is a statement that a minority in cases may be right, and

that a decision on an open question is not shown to be wrong by a naked showing that it is not as numerously supported by decided cases as is the contrary view.

It may be noted, in passing, that here, as in many other lines of decisions, numerical weight is more often evidence of a desire to shirk labor than of being controlled by the weight of reasoning. A tracing down of the lines of decisions more numerous indicates quite strongly that the leaders merely declared what is manifestly sound, to wit, that death was a basis for applying this exception. Others therefrom argued, or said by way of dictum, that death was the only basis. After these careless decisions became so numerous as to be very easy to find, other careless writers followed, without investigation of whether what was followed was really authority for holding that death was the exclusive basis.

III. While the order of commitment declares that Von Kutzlaben could not then be discharged without danger to the public, the verdict on the inquisition upon which this order is founded seems to have been without limitations, and, hence, a finding of total insanity. There is no finding or other evidence that there was either a total or even a partial recovery. All that there is is an order releasing from Anamosa because no prosecutions remained pending, and a subsequent placing of Von Kutzlaben in the hands of custodians. Hence, by presumption, it appeared at this trial that Von Kutzlaben was still totally insane. Concede that the test is whether the declarant is competent to take an oath, why is not a showing that one whose declaration is offered is then totally insane evidence that he should not be sworn?

IV. Whether the insanity was so confirmed as that Von Kutzlaben could never testify seems to be an irrelevant inquiry. The only question is, Was he competent when his declaration was offered? If, though then totally insane, his declaration is rejected, subsequent recovery has no effect one way or another. It must be assumed that, had the declaration been received instead of being rejected, it might have won the lost

suit. How does it affect the matter, after a cause is lost by excluding a declaration which should have been admitted because the declarant was too insane to be a witness, that, later, he becomes competent to testify? Unlike sickness or the like, there is no way of making subsequent recovery material. One could not ask a continuance on the ground that a witness was a total or confirmed lunatic. There would be no way of fixing the duration of the continuance—no way of giving an assurance when the condition of the witness would change, or even, at what time it was reasonably expected that a change would take place.

V.    Admit that receiving such declaration is an affirmative finding that the declarant is then incompetent, and that such finding is the basis for admitting the declaration, and it does not prove the objection that, so, a collateral inquiry is improperly injected. It may be collateral; but if so, every preliminary inquiry as to whether a proposed witness understands the obligation of an oath is equally so. Neither is it persuasive that whether a proposed witness has capacity to understand the nature of an oath can only be determined by the trial court before whom it is proposed to introduce his testimony, and that this cannot be determined until he is called to give evidence in some case.

No good reason appears why, if the competency of a witness properly becomes the subject of inquiry, it cannot be pursued unless the living witness is offered at the trial, and the matter determined then and there. Whether the witness be or be not present, and no matter how the question arises, it should suffice that the court which is asked to receive his evidence determines its admissibility by using the methods usual in judicial decisions. Here is a declaration offered. It is admissible, say, if the declarant be insane, and not admissible if he is competent to be sworn. The declarant is not in court. Why may not the question of admissibility be as much inquired into as though the question arose on the proposal of a witness who was present? If not, then there is no way of

testing whether one whose deposition is offered is a competent witness, except by losing the use of the deposition, for the deposition is not receivable if the deponent be in court. And death, concededly a sufficient basis, could not be shown, unless the corpse were present at the time that the declaration of the deceased was offered.

VI.  A holding that complete insanity of declarant at the time his declaration is offered makes the declaration competent, is not a decision that all things which prevent or make inconvenient the using of the declarant as a witness have the same effect. The vital difference is (1) that absence from the jurisdiction or asserting privilege, and the like, may be the basis of a motion for continuance, and (2) that such are created by voluntary act, and, hence, might be made a method of forcing the admission of such declarations. Manifestly, collusion cannot create total insanity. To be sure, insanity may be feigned. But that question is also part of the inquiry. And this possibility is only one illustration that the machinery of the law is not an absolute guaranty against mistake. Death may be feigned. Witnesses may be deceived by a state of catalepsy. They may assert death, falsely. The dead body of declarant is not brought into court. Death, the conceded basis for admitting the declaration, is itself found by methods that may fail to obtain the actual truth.

VII.  Still following out the line of thought that the important question is not whether insanity shall admit such declarations, but that there is great danger that the basis will not be sufficiently proved, the point is made that the rejection of the declaration amounts to a finding of fact, conclusive here, that no sufficient insanity existed. The rejection was put upon the express ground that the declaration was hearsay. It is hearsay whether the foundation of insanity was or was not proved. It follows, therefore, that the rejection did not involve a decision on whether the foundation was sufficient. Had the court expressly rejected the declaration

on account of insufficient foundation, a different question would arise.

VIII.  An attempt of defendant to obtain the deposition of Von Kutzlaben failed, because he pleaded privilege. It is suggested by the minority that his declaration should now be rejected because inability to get his testimony is not due to insanity, but to that plea of privilege.  The offer of his declaration does not rest on the fact that he at one time refused to answer, but on the claim that said declaration should now be available because at the time of offer he was insane. Had Von Kutzlaben been dead at the time that his declaration was offered, would the minority contend that the declaration was inadmissible, because at one time the declarant had refused to be interrogated as a witness? If such earlier plea of privilege would not shut out the declaration with death as a basis, then on any reasoning which makes insanity the equivalent of death, such plea of privilege would not bar the admission where insanity is a basis.

IX.  It is conceded that the declaration of Von Kutzlaben was admissible had there been testimony that he was dead at the time the declaration was offered. Why should the same declaration be rejected despite undisputed testimony that he was at said time totally insane? The exception which admits hearsay because there has been a death has for its foundation that the death has made better testimony impossible, that the ascertaining of truth is the desideratum in all judicial inquiry, and that, rather than fail in attaining the truth, inferior evidence shall be received if, by reason of death, such testimony is the best obtainable.  In a case where it is *conceded* that the declarant is totally insane when his declaration is offered, every condition is present upon which rests admitting such declaration on account of death.  While declarant is totally insane, better testimony can no more be obtained than if he were dead.  It becomes apparent, then, that the minority does not really assert that insanity can never be a basis for

admitting hearsay.  It does not claim that a complete lunatic is more available for ordinary testimony than is a corpse. On analysis, its argument makes the point that there is more difficulty in being sure of total insanity than of death.  Be that so, it but establishes that there should be greater care in accepting insanity as the basis for admitting such testimony. That, however, is no reason for rejecting it as a basis if it has been clearly shown to exist.  There is nothing said or to be said in opposition, except that in finding this insanity there may have been error, or that the court may have been deceived. As said before, that is no more true of ascertaining mental condition than of a multitude of other things the judiciary must ascertain as a foundation for decisions.

It is said in *Fish v. Poorman,* 85 Kas. 237, 243 (116 Pac. 898), and in 1 Wigmore on Evidence, § 578, that the tendency is towards the reception rather than the rejection of evidence, experience having shown that more harm results from its exclusion than from its admission.

This is quoted with approval in the remarkably able opinion in *Thurston v. Fritz,* 91 Kas., at 475, and the essence of this branch of this discussion cannot be stated better than is done by Mr. Justice West in writing that opinion:

"We are confronted with a restrictive rule of evidence commendable only for its age, its respectability resting solely upon a habit of judicial recognition, formed without reason and continued without justification."

And his further statement, in effect, that a rule should be abrogated when the reason for it has perished, may well be amplified by saying that no rule should survive beyond the moment at which it is perceived that no logical reason for it ever did exist.

X.   As I read it, the decision of the Supreme Court of the United States in *Drew, Sheriff, v. Thaw* (N. H.), 235 U. S. 432, is not in conflict with these views.  It does not determine that insanity may not be so complete as that the incompetent cannot be guilty of participating in a criminal con-

spiracy, but that whether he is so insane is for the state ·court, on defense to the charge.

XI.   There seems to me to be little occasion for adding anything in support of that part of the opinion which holds that the Von Kutzlaben declaration met the condition that it be against pecuniary interest.   If it was ever law that such a one is not against such interest, I do not think it is or should be law now.   If a declaration may be assumed to be true because its making will cost the declarant a hundred dollars, the same assumption is warranted where the statement may cost life or liberty.   Be that as it may, this declaration made Von Kutzlaben liable in damages and, hence, meets the test in any view.

PRESTON, J. (Dissenting).   I dissent as to that part of the opinion holding that the declarations and confession of Von Kutzlaben are competent.

Though insane, a person may be a competent witness if he has sufficient capacity to understand the obligation of an oath.   7 Encyc. of Evidence, p. 479; Code Section 4601.   Suppose on the next trial of this case, Von Kutzlaben, though insane, is produced in court and placed upon the stand; upon preliminary examination as to his competency, it appears that he is competent to understand the obligation of an oath, but declines to testify, because if he does so it would incriminate him.   Under the opinion as written, his declarations and confession would be admissible.   In such case, he is not as one dead.   The defendant is prevented from obtaining the benefit of his evidence, not because of his insanity, but because he claims his privilege.   Wherein is this different from a living and sane witness refusing to answer for the same reason?   In either case, the reason his evidence may not be obtained is the fact that he claims his privilege, so that the mere fact of insanity could not render the evidence of declarations competent.   It may be that the opinion is not susceptible of such a construction, but I think it is.   If the holding of the opinion

was squarely that permanent and confirmed insanity to such a degree renders the witness incompetent to comprehend the nature of an oath, and for that reason and because of his insanity, he could be placed upon the same basis as one dead, then there would be some reason for opening the door for the admission of such hearsay testimony. But I do not understand the opinion to go that far. If it does, then, in my opinion, the evidence does not show that Von Kutzlaben was in such a condition, or that he was afflicted with that degree of insanity. To my mind, the insanity shown here is no more than the usual insanity interposed as a defense in criminal cases. In fact, the defendant was claiming to be insane at the time of the derailment of the train with which he was charged. The defendant sought to take his testimony after that date, and the so-called confession was made after that date. Even after he was adjudged insane, he was discharged or released, and there is no sufficient showing that he was not mentally competent to testify.

There are other reasons than those that I have given. I am not disposed to take the time and attempt to fully cover the subject, because the case has been pending for a long time. It is desirable that the case be not longer delayed. In my opinion, the evidence is hearsay, and therefore incompetent. I would not be disposed to open the door any wider for the admission of hearsay testimony. If it is done now, the next step will be to still widen the door to admit declarations of a person whose evidence may not be obtainable because of illness or absence.

I dissent also from that part of the holding in the majority opinion that it is competent for witnesses to testify that marks were made by a crowbar. It is a matter, I think, that the jury could know as much about as the witnesses. It would be proper for the witnesses to describe the marks. If qualified as experts, they could doubtless give their opinion that such marks could have been made by a crowbar, but I think they should not be permitted to say that they were so made. *State*

v. *Rainsbarger,* 74 Iowa, at 204; *Sever v. Minneapolis & St. L. R. Co.,* 156 Iowa 664 and cases; 5 Encyc. of Evidence, 662; Lawson, Expert and Opinion Evidence, 557 *et seq.* and 571; *Cook v. Johnston,* 58 Mich. 437; *Riley v. State,* 88 Ala. 193; *Fireman's Insurance Co. v. Mohlman,* 91 Fed. 85.

Furthermore, witness had already testified without objection that the marks were so made and where they were. I think that there was no prejudice in sustaining objections to like questions on the same subject.

I would affirm.

DEEMER, J. (Dissenting). I. I am not convinced of the soundness of that branch of the opinion dealing with the admissibility of the admissions, declarations or confessions made by Von Kutzlaben, and, although the time is short for a full investigation and discussion of the subject, I am convinced that the majority, while stating the rules adopted by the great majority of the courts, have followed a very small minority and enunciated a doctrine which, carried to its logical conclusions, will admit all declarations made by a stranger against his interest, even though it be in the form of a confession, whenever, for any reason, it is either impossible or inconvenient to take his testimony, although he be alive; thus giving effect to hearsay testimony, which, of course, is not under oath, and without any opportunity to cross-examine the declarant.

Let me say first that the discussion of the majority is broader than the question presented. The sole question here is, Is testimony as to the statements made by Von Kutzlaben, a stranger to this case, admissible purely upon the ground that they were declarations against interest? Authorities regarding the admission of testimony once taken under oath, with full privilege of cross-examination, where the person giving the testimony is not available as a witness by reason of death, absence from the jurisdiction of the trial court, etc., are not in point; for in such cases, the only proposition involved is

whether or not such testimony, already taken under the sanc-. tion of an oath, and with full cross-examination, may, in a subsequent trial, be treated as a deposition; and in such cases it matters not whether the witness' testimony be for or against his interest. The sole question here is, other things being conceded, Is his testimony material and relevant to the issues, and competent to prove them? The introduction into the opinion of authorities upon this proposition gives us no help, and is liable to lead us astray in deciding the real question involved, to wit, What is essential to the admission of testimony as declarations against interest, such testimony being without the sanction of an oath, and without the usual right of cross-examination?

Testimony as to statements and declarations made by a stranger to a suit is clearly hearsay, and must be excluded unless it falls within some exception to the rule; and to come within the exception, the conditions for admission must be strictly complied with. As said by Judge Dillon, in *Mahaska County v. Ingalls*, 16 Iowa 81, the case so frequently referred to by the majority:

"It is the just observation of one of the most learned as well as experienced of American jurists, that 'The rules of evidence are of great importance, and cannot be departed from without endangering private as well as public rights. Courts are therefore extremely cautious in the introduction of any new doctrines of evidence which trench upon old and established principles.' Per Story, J., in *Nicholls v. Webb*, 8 Wheat. 332.

"This species of evidence being somewhat anomalous in its character, and standing on the *ultima thule* of competent testimony, is not highly favored by the courts, and the tendency is rather to restrict than to enlarge the right to receive it, or at least to require the evidence to be brought *clearly* within *all* the conditions requisite for its reception."

As announced by the English courts, where the rule originated, it was essential: (1) That the declarant be dead—and

to this there have never been any exceptions by the courts of the mother country; (2) that the declaration be against the pecuniary or proprietary interest of the declarant—and, as a rule, confessions of crime or declarations which might create a civil or criminal liability were not admitted. These propositions are conceded by the majority, but, notwithstanding, some other exceptions adopted by a very few courts are treated as the equivalent of death, and these exceptions, if once introduced into the body of our law, must be carried to their logical conclusion, and in the future held to cover all cases where, for any reason, the testimony of the declarant cannot be had for the trial.

Must the declarant be dead? The rule is, Yes. Shall we introduce something else? This question was first answered by Lord Ellenborough, in *Harrison v. Blades,* 3 Camp. 457, 458, in this way:

"No case has gone so far and I am afraid to establish a precedent. It is difficult to determine when a patient is past all hopes of cure. If such a relaxation of the rules of evidence were permitted, there would be sudden indispositions and recoveries."

Where the question has come before the courts of this country, the same result was reached. *Currier v. Gale,* 14 Gray (Mass.) 504; *Rand v. Dodge,* 17 N. H. 343; *Jones v. Henry,* 84 N. C. 320; *Churchill v. Smith,* 16 Vt. 560; *Miller v. Wood,* 44 Vt. 378; *Lowry v. Moss,* 1 Strob. (S. C.) 63; *Buchanan v. Moore,* 10 S. & R. (Pa.) 275; *Carpenter v. Hatch* (N. H.), 15 Atl. 219; *Baker v. Taylor* (Minn.), 55 N. W. 823; *Fitch v. Chapman,* 10 Conn. 8; *Humes v. O'Bryan,* 74 Ala. 64. In some of the cases, the declarant was insane; in others he was beyond the jurisdiction of the courts; in others, too ill to attend trial; and in one, stricken with apoplexy so that he could not speak. In but one case to which my attention has been called has a different rule been held, and that is *Griffith v. Sauls* (Tex.), 14 S. W. 230. That case was decided without any apparent investigation of the authorities, for none are

cited or relied upon in support of the opinion. In our own case of *Mahaska County v. Ingalls, supra,* Judge Dillon says that absence from the jurisdiction of the court will not answer, citing *Brewster v. Doane,* 2 Hill (N. Y.) 537; *Moore v. Andrews,* 5 Port. (Ala.) 107. True, he adds:

"We need only say that probably the courts would not be inclined to relax the rule so as to dispense with this condition (death) unless it might be in the case of confirmed insanity."

Surely this is not a decision that insanity is the equivalent of death, and even this guarded expression says "confirmed insanity."

As said by my brother Preston, in his dissent, even if we were to recognize insanity as the equivalent of death, it must be confirmed insanity, and here there is no proof that Von Kutzlaben is a confirmed lunatic in the sense that he was unable to understand the nature and character of an oath. He has been released by a court, and by a proper board of insanity, is now at large, and there is no showing as to the nature of his mental disease when declared insane. As I understand it, in the celebrated *Thaw* case, it was contended that, as Thaw was the inmate of an insane asylum in the state of New York, this was a conclusive determination that he was so insane that he could not be guilty of a conspiracy to procure his escape. Although I have not seen the opinion of the Supreme Court of the United States, I understand that this position was declared untenable, and Thaw was sent to New York for a trial, where the question of his insanity as applied to the charge might be investigated.

In this state, every human being of sufficient capacity to understand the nature of an oath is a competent witness. When was it determined that Von Kutzlaben did not have capacity to understand the nature of an oath? That question could only be determined by the trial court before whom it was proposed to introduce his testimony, and it has never been determined, nor could it be until he was called to give evidence in some case; for it is his capacity at that time and as to a

particular matter that is to be inquired into.  This has never been done, and it seems to me that, conceding his insanity as to certain things, there is nothing here to show that the degree of his insanity is the same as if he were dead—that is to say, that he was unable to take an oath, and therefore as dead as if he were in his grave.

It should be stated that, since writing the foregoing, I have discovered another case which seems to hold with the majority, but that case is also authority for the proposition that inability to produce the declarant's testimony from any cause, as absence from jurisdiction, physical or mental incapacity, assurance that the witness would claim his privilege, or immunity from giving testimony, is the equivalent of death.  Logically this is true, but none of the members of this court are prepared to go to this extent.  The line must be drawn somewhere, and I think that it is safer to announce the one generally adhered to, that the declarant must be physically dead.  Once say that something else is the equivalent, there is no stopping.

In *Hutchinson v. Watkins*, 17 Iowa 475, this court excluded testimony as to declarations because the declarant was alive, within the reach of a subpoena, and competent to testify.

II.   Again, the declaration must be against the pecuniary or proprietary interest of the declarant.  That the confession or declaration here involved was not against the declarant's proprietary interest is, of course, true, and the question remains, Was it against his pecuniary interest?  It is everywhere held, as I understand it, that confessions of a crime made by one, which, of course, are against his interest, are not admissible.  When this matter was first broached in England, Lord Brougham said:

"To say, if a man should confess a felony for which he would be liable to prosecution, that therefore, the instant the grave closes over him, all that was said by him is to be taken as evidence in every action and prosecution against another

person, is one of the most monstrous and untenable proposi-
tions that can be advanced.'' Sussex Peerage case, 11 Clark
& F. 85; *Smith v. Blakey,* L. R. 2 Q. B. (1866-1867) 326.

See, also, *Davis v. Lloyd,* 1 Car. & K. 275, 276.

The following American cases are also to the same effect:
*People v. Hall* (Cal.), 30 Pac. 7; *Commonwealth v. Chance,*
174 Mass. 245; *Benton v. Starr* (Conn.), 20 Atl. 450; *Farrell
v. Weitz,* 160 Mass. 288; *Ayer v. Colgrove,* 81 Hun. 322;
*Penner v. Cooper,* 4 Munf. (Va.) 458.

There is some conflict in the decisions on this point, and
one case seems to hold that, if the admission made by the
declarant might have been sufficient to justify a recovery
against him in a civil suit, this is sufficient to satisfy the
requirement that it was against interest. See *Halvorsen v.
Lumber Co.,* referred to by the majority. I am not prepared
to say that this is the only case so holding, and I concede that
there is a conflict upon the proposition; but, notwithstanding,
we held at an early day that declarations which, if true, might
be used as evidence against one in a civil case for tort, are not
declarations against pecuniary interest. That case is *Ibbitson
v. Brown,* 5 Iowa 532, which has never been doubted or chal-
lenged since its announcement.

Quite in point on this proposition, I think, is the rule that
a defendant charged with crime cannot introduce in his
defense the confession made by another, then deceased, that he
had committed the offense with which defendant was charged,
which confession or admission would or might have made him
liable in tort as well as criminally responsible. This is held
by practically all the cases: *Davis v. Commonwealth,* 95 Ky.
19 (23 S. W. 585); *State v. West* (La.), 12 So. 7; *Common-
wealth v. Chabbock,* 1 Mass. 143; *Helm v. State* (Miss.), 7
So. 487.

Again, we have held that a defendant charged with mur-
der could not introduce in his defense a statement of the
deceased that he (defendant) was in no way to blame. *State
v. Sale,* 119 Iowa 1.

Whilst I do not regard this proposition as decisive of the question here being argued, I cite it as opposed to the doctrine of *State v. Alcorn,* 7 Ida. 599 (64 Pac. 1014), relied upon by the majority. Other cases support *State v. Sale, supra.* They are cited in 4 Chamberlayne on Evidence, Sec. 2779. The list includes cases from nearly every state, and shows the trend of the authorities.

*Georgia R. Co. v. Fitzgerald,* 108 Ga. 507, cited by the majority, announces a doctrine which I do not think the majority approve. It is this:

" 'Self-disserving' declarations made by a deceased person having peculiar opportunities to know the truth as to the matter under investigation may be proved even in cases between third parties, none of whom claim under or through him."

If there be any such rule of evidence, I confess that I have not been able to find it announced in any other decision. Self-serving declarations are never admissible, as I understand it, unless part of the *res gestae,* no matter whether made by a third person or a party to a suit.

In *Walker v. Brantner,* 59 Kas. 117 (52 Pac. 80), the declarations admitted were of the deceased husband of the plaintiff in a suit brought by the wife for damages due to the death of the husband. It is difficult to see on what theory these were admitted, as against his (declarant's) pecuniary or proprietary interest. They were doubtless admissible, if at all, as part of the *res gestae,* or as of one in privity with the plaintiff. I see no reason for departing from the rule announced in *State v. Sale.* It has the great weight of authority in its support.

In *Mahaska County v. Ingalls, supra,* the effect of the admission was that declarant had in his possession certain money which he had taken from the county, from which a promise would be implied on his part to return the same, and from which the inference would arise that in the amount of the money thus taken, he had a pecuniary or proprietary interest.

In *Moehn v. Moehn*, 105 Iowa 710, cited by the majority, the declarations of a deceased payee and indorser of a note that the note had not been paid were held inadmissible as a declaration against interest, in the absence of proof that the maker was insolvent.

In *Ellis. v. Newell*, 120 Iowa 71, also relied upon by the majority, the declarations of a deceased donor, made subsequently to a gift and not a part of the *res gestae*, to the effect that the conveyance was intended as a gift, and not as an advancement, were held inadmissible, as not being against his pecuniary interest, following *Westcott v. Westcott*, 75 Iowa 628.

In this connection, a distinction must be made between ordinary declarations, and entries or other writings of deceased persons in the course of business. This latter is covered by statute. Code Sec. 4622.

A very pretty question will arise upon a retrial of this case, if one be had, if it be shown on that trial that Von Kutzlaben was insane when he made the declarations. If the majority is correct, his declarations cannot be received in evidence at all, because of his being a lunatic. Whereas, according to at least one case, declarations made by an infant, who was not permitted to testify on the trial of a case because he did not understand the nature of an oath, were permitted to be shown as admissions against interest. See *Atchison, T, & S. F. R. Co. v. Potter* (Kans.), 72 Am. St. 385.

I admit that there is considerable confusion in the cases upon the proposition now being considered, due to the failure of courts to observe the distinction between admissions .and confessions, declarations explanatory of possession, dying declarations, declarations or statements which were a part of the *res gestae*, and declarations in form of testimony given in a prior proceeding, the witness having died after his testimony was taken; and entries made by a deceased person in the course of his business, as books of account, or as a public official.

The question before us is clear and distinct. Was the

testimony as to what Von Kutzlaben said admissible as a declaration against interest? After as careful an investigation as I have been able to make in a limited time, I think that the testimony was inadmissible.

In view of the concurring opinion written by brother Salinger, since this dissent was prepared, it seems appropriate to make some further observations in an attempt to clarify the law.

In the first place, the argument for the establishment of a new rule of evidence, based upon the decision in the *Mentzer* case, which applied old principles to new situations due to changes in the industrial and commercial world—changes not foreseen or to be reasonably apprehended when another basic rule was established—is rather a forced analogy. Damages for mental anguish had always been allowed before the Morse invention, and when a telegraph company failed in its duty, either arising out of contract or one imposed by law, the question of the measure of damages of necessity became a new question, upon which either the rule to award damages for mental anguish or to deny them might be established. It was the opinion of this court that, following old and established principles, damages for mental anguish might be allowed. Other courts were of contrary opinion, and no recent count of cases has been made on this proposition. One thing may safely be assumed from the establishment of the rule for this state: that telegraph companies have been more diligent in doing their duty with reference to death messages; and it may also be noticed that the apprehended flood of litigation from the establishment of the rule has not occurred. In the instant case, for more than a century there never has been any doubt about the rule as to declarations against interest, until not more than two courts in this country, apparently without consideration of authorities, announced another rule with reference thereto. One of these cases is so thoroughly discredited in both the majority and concurring opinions that it is no longer a staff upon which to lean; and the other, as an examination will

show, is so poorly considered that it, too, affords feeble support.

It is to be noted that no new conditions have arisen, calling for a different rule of evidence. From the time of its original pronouncement, witnesses were bound to die, were likely to become insane, or to be stricken with apoplexy, or to go beyond the seas, or to be ill. None of these things are of modern invention, and the reasons for their inclusion, as exceptions to the hearsay rule, were quite as potent as in this day and age of the world.

The substantive law must, if it is to meet the needs of a changing civilization, of the progress of events of the industrial evolution and revolution, continue to grow and to expand. The adjective and remedial law, being in their essence either analysis or logic, must also grow; but in this growth it can never get away from established principles, except by legislative enactment.

The fundamental rules of evidence should be stable; for, after all is said, they are the only safeguards to the ascertainment of truth in a judicial investigation. So that every circumstance which the majority now considers as having a bearing upon what the rules and exceptions to the hearsay rule should be were just as clear to the judges who established them as they are to us. At this point, it is well to recall Judge Dillon's reference to the dangers to be apprehended in departing from well-settled rules of evidence.

It is not clear whether the author of the concurring opinion is announcing the rule that everyone committed to a state hospital for the insane is presumed to be there for confirmed insanity, is totally insane, and incompetent to be sworn as a witness,—which presumption cannot be rebutted by showing that, notwithstanding the adjudication, he does in fact understand the nature and obligation of an oath,—or whether it is a rebuttable presumption which is subject to proof as to the fact of his competency. Again, it is difficult to understand whether the majority of the court means to hold that

one adjudged insane is conclusively presumed to be incompetent to give testimony. The majority uses the words "total insanity" and "confirmed insanity" as the same thing. I do not think they are the same, although the majority is doubtless logical in saying that insanity established is confirmed, and, being confirmed, is total. Total insanity means, to my mind, utter, absolute insanity; the equivalent of imbecility or idiocy. It seems to me that it must be this to be the equivalent of death. What is there in this record to show any such degree of insanity? Nothing but a record that Von Kutzlaben was insane and ordered committed until he became sane. Nothing more was determined than that he was a fit subject for confinement in the hospital until he became sane. He was then released on habeas corpus and sent to the Jones County board of insane commissioners for hearing, and, upon that hearing, it was found that it was safe for him to be discharged; but he was ordered taken and delivered to the custody of his mother; and the record shows that this confirmed lunatic, this man who is the same as dead, is now at large, residing either in Chicago, or at some place in New Jersey. I do not think that there is any finding anywhere that he is, or at any time was, the same as dead, mentally incompetent to give testimony, or that he was ever adjudged to be totally insane.

To cap the climax at this point, it appears that the defendant, through its counsel, sued out papers to take the testimony of this witness, went to Anamosa, had him sworn as a witness, and would undoubtedly have taken his full deposition, but was thwarted in its efforts to do so, because this witness, on advice of counsel, claimed his privilege, on the ground that answers might tend to incriminate him. This attempt to take the deposition was in July, 1907, and the confession was made in March of the year 1905. It seems, then, that the real reason for claiming that his confession is admissible is because he voluntarily, when sane, closed his mouth

on advice of counsel, which he had the right to do, and no power on earth could compel him to open it.

Although the majority says that he was then sane, he was dead so far as that no power could make him speak. Is this the equivalent of death? To be logical, the majority must so affirm, and this is really what I understand the opinions to hold; for, no matter what his condition thereafter, sane or insane, it is not his insanity which prevented defendant from getting his testimony.

Where is the finding that, when the declaration was offered in evidence, the witness Von Kutzlaben, who had then been discharged both by a court on habeas corpus and by the board of insane commissioners, was then at liberty and not in the custody of anyone, was then totally insane, to the same extent as if he were dead, and could not speak? Does the majority hold that, because a witness claims his privilege from testifying, his declarations against interest may be received as if he were dead? There is more reason for so saying than to affirm that, as he is insane, and although he may speak and testify, his declaration against interest may be received. Especially where defendant undertook to get his deposition, thus affirming his sanity, but was prevented because the witness claimed his privilege.

Again, it seems to me that the majority is bound to say that one found to be insane, no matter what the degree of his insanity in fact, is conclusively presumed to be incompetent, and therefore cannot be permitted to even take an oath, or that the presumption is rebuttable, and if rebuttable, it then becomes a question of fact as to whether or not he was in fact of sufficient capacity to understand the nature and obligation of an oath, with nothing more, at best, than a mere rebuttable presumption of incompetency. If the majority insists upon the former rule, then I most emphatically dissent. If the latter, then it must be conceded that the question of the admissibility of the evidence was primarily for the court, and there was testimony to sustain the ruling. If the ruling was

correct, it matters not on what ground it was placed, and the objection to the testimony was sufficient to justify the trial court in sustaining it on the ground suggested.. As already noted, at one time the defendant itself conceded that the witness was competent to testify. It had him sworn, and proceeded as far as it could in taking his testimony, and is now complaining in this very case because plaintiff's counsel suggested to the witness that he should not answer some of the questions propounded. It thus appears that the witness is not only at large, having the same liberty as normal persons, but, in addition, there is a judicial and semi-judicial finding that he should be discharged from custody, and that it was safe for him to be at large, and the further fact that at one time defendant itself had him sworn as a witness, and is now complaining because he was not permitted to testify. It was not insanity which closed his mouth.

In the face of this record, what becomes of the presumption that he was an incompetent witness, totally insane, and dead to the world?

On other matters, I concur with Justice Preston, and would affirm.